UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| THADDEUS RODRIGUEZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:22-cv-02205-TWP-CSW |
| | ) |
| ZATECKY Warden, | ) |
| JACK HENDRIX IDOC Classification Committee, | ) |
| PAULA DICKSON IDOC Classification Committee, | ) |
| J. COOK Case Worker, | ) |
| JOHN STAFFORD Case Worker Supervisor, | ) |
| ARNOLD Case Worker, | ) |
| BALLENGER IDOC Classification Committee, | ) |
| | ) |
| Defendants. | ) |

## **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on Defendants' Motion for Summary Judgment. (Dkt. 67) and *pro se* Plaintiff Thaddeus Rodriguez's ("Mr. Rodriguez") renewed Motion to Appoint Counsel (Dkt. 83). Mr. Rodriguez is an Indiana Department of Correction ("IDOC") inmate currently housed at Plainfield Correctional Facility ("Plainfield"). In this action, he alleges the Defendants held him in segregation at Pendleton Correctional Facility ("Pendleton") for an extended period– from November 2016 to November 2020–without meaningful review in violation of his Fourteenth Amendment rights. He further alleges that he was subjected to unconstitutional conditions of confinement while in segregation in violation of his Eighth Amendment rights. For the reasons explained below, the Defendants' motion for summary judgment is **granted** and the motion for recruitment of counsel is **denied as moot**.

1

## I. STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

Plaintiff failed to respond to the summary judgment motion. Accordingly, facts alleged in the motion are "admitted without controversy" so long as support for them exists in the record. S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for

summary judgment, the movant still has to show that summary judgment is proper given the undisputed facts." *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up).

## II. FACTUAL BACKGROUND

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Rodriguez and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

Mr. Rodriguez brings claims against five Defendants: Zatecky ("Warden Zatecky"), Jack Hendrix, Paula Dickson, John Cook ("Mr. Cook"), John Stafford, Daniel Arnold ("Mr. Arnold"), and Jeff Ballenger (collectively "the Defendants").

In January of 2016, Mr. Rodriguez was an inmate at Wabash Valley placed on administrative segregated housing. (Dkt. 68-5 at 13). In November of 2016, he was transferred to Department-Wide Restrictive Status Housing ("Restrictive Housing") at Pendleton. (Dkt. 68-6 at 1). Warden Zatecky was the Warden at Pendleton. (Dkt. 68-5 at 29-30). Warden Zatecky was not involved in providing Mr. Rodriguez with periodic reviews. *Id.*

Jack Hendrix was the Executive Director of Classification for the IDOC and a member of the classification committee. (Dkt. 45 at 1-2). Paula Dickson was a classification supervisor at Pendleton, and Jeff Ballenger was a classification specialist at Pendleton. (Dkts. 68-1 at 1, 68-4 at 1). Dickson and Ballenger were both members of IDOC's classification department, which oversees the classification for all inmates at Pendleton. *Id.* They conducted annual reviews for all offenders where they reviewed each inmates' security level, education status, and medical and mental health codes. The classification department did not conduct 30-day and 90-day reviews for inmates on Restrictive Housing. *Id.*

John Cook ("Mr. Cook") was a Casework Manager and John Stafford was a Casework Supervisor at Pendleton. (Dkt. 68-2 at 1). Daniel Arnold was a member of the G cell house unit team at Pendleton. (Dkt. 68-3 at 1). As a casework manager, Mr. Cook was involved in conducting administrative reviews for inmates housed in administrative restrictive status housing, including inmates classified to Restrictive Housing. (Dkt. 68-2 at )1.

### B. Department-Wide Restrictive Status Housing IDOC Policy

Inmates in Pendleton's Restrictive Housing unit received reviews every thirty days, which consisted of a casework manager, such as Mr. Cook, verifying with other departments to see if there were ongoing security issues or any reservation with the inmate being released from restrictive housing (Dkt 68-2 at 2). Mr. Cook would fill out the review, present it to the inmate for signature, and inform them of their expectations for release from Restrictive Housing, including what guidelines they needed to follow to be released from segregation. *Id.* Mr. Cook would then make a note in the inmate's case notes regarding the review. *Id.*

If an inmate was deemed a security risk or they had received a recent conduct report, they would continue to remain on Restrictive Housing status. *Id.* Inmates on Restrictive Housing status needed to remain conduct clear for approximately one year to be recommended for release. *Id.* The process for an inmate's release from Restrictive Housing began with a recommendation for release made by the unit team comprised of caseworkers, casework managers, and unit team staff. (Dkt. 63-3 at 2). The recommendation was then reviewed by multiple offices including the Office of Intelligence and Investigations, the warden's office, and custody staff. The warden's office would ultimately make a recommendation to IDOC central office, which had the final authority to decide whether an inmate would be released from Restrictive Housing status. *Id.*

### C. Mr. Rodriguez's Classification History

In November of 2016, Mr. Rodriguez was assigned to Restrictive Housing at Pendleton. (Dkts. 68-6 at 1, 68-5 at 17). When Mr. Rodriguez was housed in Restrictive Housing at Pendleton, he received 30-day and 90-day classification reviews. *Id.* at 26. For 30-day reviews, a caseworker would come to his cell and present him his review documents. (Dkt. 68-5 at 21). For 90-day reviews, caseworkers would not provide him with an explanation regarding his classification, but they would give him an opportunity to sign the reviews. *Id.* at 35-36.

On November 21, 2016, Mr. Cook made an entry into Mr. Rodriguez's case notes indicating that he reviewed his offender packet. (Dkt. No 68-8 at 2). Mr. Cook that Mr. Rodriguez was currently housed on Restrictive Housing status due to poor behavior and recommended that Mr. Rodriguez refrain from receiving any additional conduct violations. *Id.*

While in Restrictive Housing, Mr. Rodriguez accumulated multiple conduct charges. (Dkt. 68-7 at 1-2). He received two class B conduct reports on April 20, 2017, two class B conduct reports on September 14, 2017, and a class A conduct report on May 17, 2018. *Id.* Mr. Rodriguez understood and IDOC policy dictated that he needed to be conduct-clear for one year before he could be released from segregation. *Id.* at 16, 31. He filed numerous classification appeals throughout the four-year period he remained in Restrictive Housing. (Dkts. 68-5 at 28-29, 68-6 at 1).

On February 27, 2017, a nonparty IDOC employee conducted a 90-day review for Mr. Rodriguez. (Dkt. 68-8 at 4). This review was signed on March 2, 2017, by Mr. Cook and Unit Team Member, Mr. Arnold, and included numerous factors considered in Mr. Rodriguez's continued segregation placement. (Dkt. 68-9 at 4). Some of these factors included his security threat group confirmation and his recent conduct from the past twelve months. *Id.*

On May 22, 2017, a nonparty IDOC employee reviewed Mr. Rodriguez's annual review with him. Dkt. No 68-8 at 6. Another review was performed on June 15, 2017, which indicated that a committee decided that Mr. Rodriguez would remain on Restrictive Housing status because of his conduct. *Id*. at 7. Nonparty IDOC employees again conducted 90-day reviews for Mr. Rodriguez on December 28, 2017, March 28, 2018, and May 16, 2018, indicating that due to frequency of previous conduct reports, he would remain on Restrictive Housing. *Id.* at 12. Nonparty IDOC employees also conducted 90-day reviews for Mr. Rodriguez on June 27, 2018, September 25, 2018, and December 21, 2018. *Id*. at 14-17.

On April 11, 2019, Mr. Arnold conducted a 90-day review indicating that Mr. Rodriguez would remain on Restrictive Housing status due to the frequency of previous conduct reports. *Id*. at 18, 32. On May 30, 2019, Mr. Arnold completed Mr. Rodriguez's annual review indicating that he instructed Mr. Rodriguez that he would need to remain conduct clear in order to be removed from Restrictive Housing. *Id*. at 19.

On May 25, 2019, Warden Zatecky wrote a letter to the IDOC Southern Regional Director recommending Mr. Rodriguez's release from Restrictive Housing to administrative segregation and included a review of his history on Restrictive Housing with several conduct reports. (Dkt. No 68-9 at 15). Warden Zatecky wrote similar letters on August 29, 2019, February 21, 2020, and June 11, 2020. *Id*. at 13, 19, 21 On March 9, 2021, Mr. Rodriguez was recommended for release from administrative segregation and permitted to transfer to any level four general population facility. (Dkt. 62-2 at 17).

D.  **The Conditions of Mr. Rodriguez's Confinement**

Mr. Rodriguez testified in his deposition that G Cell House had a "nasty smell" like urine. (Dkt. 68-5 at 59). There were bird feces and human feces on the walls, and he was not provided

6

cleaning supplies while confined in Restrictive Housing. *Id.* However, Mr. Rodriguez did testify later that he was provided with cleaning supplies once or twice a month. *Id.* at 66. During COVID, there was trash piling up in his cellblock and over 20 birds living within his cellblock. *Id.* at 59-60. Mr. Rodriguez received meals early, and meal trays would sit while birds were flying around the block. *Id.* There was an instance where a cockroach was in his tray. *Id.* Mr. Rodriguez reached out to classification or "somebody that was in charge" but usually lodged complaints with whoever was around him at the time *Id.* at 65. He talked to the counselors and notified lieutenants and sergeants that oversaw the house about cleaning supplies. *Id.* at 66. The unit team and classification department were not responsible for cleaning or sanitation within G Cell House. If an inmate made a complaint about a cleaning or sanitation issue, Defendants would forward that complaint to custody staff. (Dkts. 68-3 at 2-3, 68-2 at 3, 68-1 at 2, 68-4).

Mr. Rodriguez filed his Amended Complaint on August 23, 2023, alleging that he was housed in restrictive housing in unsanitary conditions from November 2016 to December 2020 at Pendleton Correctional Facility without meaningful reviews in violation of his Eighth and Fourteenth Amendment rights. (Dkt. No. 21-1). Defendants' summary judgment motion is ripe for review.

### III. DISCUSSION

Mr. Rodriguez argues the Defendants violated his constitutional due process rights under the Fourteenth Amendment and violated his Eighth Amendment rights by subjecting him to unconstitutional conditions of confinement. The Defendants seek summary judgment, arguing that Mr. Rodriguez was provided with periodic and meaningful reviews throughout his time in Restrictive Housing and that these reviews eventually led to his release from segregation. Defendants further argue that they did not have personal involvement regarding the conditions of

7

Mr. Rodriguez's confinement. Because the undisputed record supports the Defendants' argument, and no reasonable trier of fact could reach a different conclusion, summary judgment must be granted.

### A. Fourteenth Amendment Claims

"Inmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008). "Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate." *Hewitt v. Helms*, 459 U.S. 460, 477, n.9 (1983). "Prison officials must engage in some sort of periodic review of the confinement of such inmates." *Id.* Due process does not require periodic reviews to be formal or adversarial. *Id.* at 472. Inmates are not ordinarily entitled to present evidence or statements. *Id.* at 477 n.9. Rather, periodic reviews must be "meaningful," which is to say they must be "open to the possibility of a different outcome." *Isby v. Brown*, 856 F.3d 508, 527–28 (7th Cir. 2017).

Similarly, due process does not require custodians to conduct their periodic reviews according to rigid timelines. "The periodic review need only be sufficiently frequent that administrative segregation does not become 'a pretext for indefinite confinement of an inmate.'" *Westerfer v. Neal*, ,682 F.3d 679, 686 (7th Cir. 2012) (quoting *Hewitt*, 459 U.S. at 477, n.9). Otherwise, the frequency of periodic reviews "is committed to the discretion of the prison officials." *Isby*, 856 F.3d at 525.

The record reflects that Mr. Rodriguez was provided with frequent 30-day, 90-day, and annual reviews that included numerous factors IDOC considered in maintaining his status within Restrictive Housing. The Defendants have designated evidence that the reviews he received did provide for the possibility of a different result if he remained conduct free for one year. *See Isby*,

856 F.3d at 527-28 (periodic reviews must be "meaningful," which is to say they must be "open to the possibility of a different outcome."); (Dkts. 68-8, 68-9). Although his review forms and case notes had similarities to each other, they provided additional information regarding new conduct violations along with Mr. Rodriguez's behavior plans, indicating that completion of these plans could result in release from segregation. *See, e.g.*, (Dkt. 68-8 at 6) (Nonparty IDOC employee discussing Mr. Rodriguez potentially completing a substance abuse program to further refrain from conduct violations); 9 (found guilty of conduct violation); and 14 (advisement by IDOC staff to remain conduct clear for next review period for eligibility for removal to ARSH).

The Court recognizes that not all of Mr. Rodriguez's reviews were thoughtful and detailed. However, multiple reviews over the course of his time in Restrictive Housing provided insight into his behavioral progress, history of conduct violations, ability to succeed in general population, and goals. Moreover, even if Mr. Rodriguez's 30-day reviews were not meaningful, the designated evidence reflects that Mr. Rodriguez was provided with meaningful reviews by way of IDOC's responses to his classification appeals.

When Mr. Rodriguez submitted his first classification appeal, it was denied by an IDOC nonparty employee because of his recent conduct reports. (Dkt. 68-10 at 1). However, his second classification appeal in November of 2020 affirmed that the delay in his transfer was due to COVID, and that he had been approved for transfer since March of that year. *Id.* at 3. He was then moved a month later. (Dk. 68-6). In short, it is undisputed that the Defendants did conduct periodic, meaningful review of Mr. Rodriguez's placement in segregation. Defendants are therefore entitled to summary judgment on Mr. Rodriguez's Fourteenth Amendment claims.[1]

---

[1] Because the Court grants the Defendants' motion on substantive grounds, the Court need not analyze whether the Defendants are entitled to qualified immunity.

### B. Conditions of Confinement

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

The uncontested evidence reflects that none of the Defendants were responsible for the conditions of his confinement Mr. Rodriguez contends were deficient. "'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.* The Defendants named in this case consist of members of the unit team, classification department, and Pendleton and IDOC administrators, but the evidence reflects that none of these individuals were actually responsible for cleaning or sanitation within G Cell House.

10

If an inmate made a complaint about a cleaning or sanitation issue, these Defendants would simply forward that complaint to custody staff who were responsible for maintaining sanitation at Restrictive Housing. Accordingly, no reasonable juror could find that the Defendants were personally involved in Mr. Rodriguez's Eighth Amendment claims, and summary judgment must be granted in their favor.

## IV. CONCLUSION

The Court recognizes the severe challenges and detrimental effects of being held long-term in restrictive housing status, and condemns the conditions that Mr. Rodriquez experienced. However, the named Defendants are entitled to summary judgment because they afforded Mr. Rodriguez adequate and meaningful periodic reviews which led to his release from restricted housing and they were not deliberately indifferent to the conditions that posed a serious threat to him. For the reasons explained in this Order, the Defendants' Motion for Summary Judgment, Dkt. [67], is **GRANTED.** Mr. Rodriguez's renewed Motion to Appoint Counsel, Dkt. [83] is **DENIED** as moot.

Final judgment consistent with this Order and the Court's screening orders, (Dkts. 8 and 44), will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 1/20/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

THADDEUS RODRIGUEZ
964882
PLAINFIELD - CF
PLAINFIELD CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All Electronically Registered Counsel